Booth, Judge,
delivered the opinion of the court.
When the United States enters into a contract with a citizen the elementary principles of contractual relations govern. The instrument which evidences the reciprocal obligations of the parties thereto is in nowise exceptional, and no greater privileges are to be accorded the United States under the circumstances than accrue to individuals similarly situated.
The Treasury Department, prior to November, 1917, was engaged in preliminary preparations for the flotation of the third Liberty loan. The idea of popular subscription was foremost, and to this end wide publicity was given, in order to arouse the interest of the people. One feature of the very laudable plan was the circulation of large numbers of attractive posters, so framed as to appeal to the patriotism and generosity of the people. The plan evolved to attain this desired end was the issuance on November 1, 1917, of a circular to lithographers and artists throughout the country inviting them to submit to the department appropriate sketches for posters, and expressly setting forth in said circular that all sketches so submitted would become the property of the defendant, without compensation to the owner, *352 and subject to be reproduced by any successful bidder who might thereafter be awarded a contract to reproduce the same. A preference was given to the originator of the sketch accepted if it appeared subsequent to the receipt of bids to do the work that he or they possessed adequate facilities and would assent to reduce his bid and thereby meet the figures of the lowest competitor. The obvious intent of the public invitation thus extended was to secure for the defendant the widest range of selection and at the same time encourage competition by the hope of ultimately securing the contract for reproducing the poster. Care was taken to relieve the defendant from all contractual responsibility, through copyrights or otherwise, by compelling all competitors to dedicate their sketches to the public and vest exclusive title thereto in the defendant without compensation or other reward. The invitation simply extended to the presentation of tentative sketches to the defendant, from which it would make a selection and subsequently award a contract for reproduction of the same. The competitors had no voice in the selection and no part in the preliminary proceedings other than the physical presentation of that which they deemed of sufficient merit to win the award. The plaintiff company submitted a design, a poster 20 by 30 inches, upon which were the words “Buy Liberty Bonds,” followed by a profile of President Lincoln, and beneath it in plain and distinct printed words at least seven-eighths of an inch in height the following alleged excerpt from his Gettysburg address: “ So that government by the people, of the people, and for the people shall not perish from the earth,” to which was added a facsimile of President Lincoln’s signature. Beneath this were the following words: “From the Gettysburg address,” which, at the request of defendant, were eliminated from the sketch. This design, altered at the defendant’s request, was in the possession of the defendant from about the middle of November, 191T; not a single copy, but many copies, some exhibits being lithographed in a quadruple series attached; it was on public exhibition and subjected to the scrutiny of the parties charged with the duty of making the awards. Two days before the plaintiff company was awarded the contract for *353 reproducing the same the defendant pronounced it “excellent.”
On January 24, 1918, the plaintiff company was awarded the contract for reproducing the poster and agreed to furnish within the time specified one-half million Lincoln posters for $8,500. The plaintiff company complied with said agreement. An exact reproduction of the preliminary sketch, except as deleted at the request of the defendant, was furnished. They were lithographed, inspected, delivered, and every express term of the contract fully and completely discharged by the plaintiff without complaint or objection by the defendant. On February 27, 1918, after all of said posters had been lithographed, delivered, and accepted, an error was discovered by one of the defendant’s publicity agents in the wording of the extract from President Lincoln’s Gettysburg Address. The quotation was erroneous. The defendant thereafter sought to decline delivery of the posters, place the responsibility for the mistake upon the plaintiff, and thus cause it to lose the purchase price stated in the written agreement. The plaintiff company declined to accept the defendant’s conception of its rights. The time for the release of the posters was drawing near, the needs of the defendant were imminent, and the plaintiff, reserving its rights under the original contract, very commendably ac-ceeded to the defendant’s later and urgent request for other and corrected posters, and expeditiously furnished and delivered the same, which were duly accepted and paid for. The defendant refused to pay for the original posters furnished under the contract because of some doubt as to its liability therefor, leaving the ultimate decision to the courts.
It has seemed to us from a careful consideration of the record and after an elaborate oral argument of counsel that a substantial defense to the claim would assuredly tax the ingenuity of the party presenting it. If we are correct in our conception of the argument advanced to defeat it, it is predicated upon three precise contentions, among which is the rather startling assertion that “the quotation on the imperfect poster amounted to an implied warranty of its genuineness, and that the same was correct as thus repre *354 sented,” notwithstanding it was quoted, the authorship given, and the address identified. It is manifestly difficult to comprehend wherein an express or implied warranty arises by reason of a transaction wherein a party voluntarily and without consideration, at the request of another, submits a sample of an article which the other desires to purchase, the ultimate selection resting entirely upon its peculiar merit over and above numerous other samples of a similar character, and in addition dependent exclusively upon the judgment and taste of the purchaser. We had always supposed that if an implied or expressed warranty in any way attached to a transaction of this character it extended no further than an exact duplication of the sample furnished for the purchaser’s inspection, without the slightest obligation to buy until he had satisfied himself as to its quality and perfection, eliminating, of course, the question of fraud.
The doctrine thus advanced, if carried to its logical conclusion, would indispensably involve the plaintiff company in pecuniary liability under the circumstances narrated in the findings had some other one of the numerous bidders for this work procured the contract, for by the express ternas of the invitation to submit sketches it renounced all proprietary interest in the sketch and threw its reproduction open to the public. If a palpably honest and not uncommon mistake carries with it such dire responsibilities and unlimited liability, then one dealing with the defendant, as the plaintiff herein, might well hesitate to accept them. There was never any contractual obligation on the part of the plaintiff to do anything for anybody until it accepted the tendered contract to refroduce the sketch it had voluntarily furnished the defendant, and this it did without protest or objection, until after the completion of the contract and the acceptance of the posters.
The mode resorted to by the defendant in this case to secure some needed supply or negotiate an authorized contract is not unusual. We have had occasion heretofore to pass upon the transactions of a similar character. The Supreme Court in the case of Lord c& Hewlett v. United States, 211 U. S. 340, 341, in a brief opinion, conclusively *355 commented, upon the respective rights of the parties in so far as preliminary negotiations were concerned. The contract is the only instrument to which we may look in determining the contractual rights and liabilities, and when viewed in its entirety it. is obvious that the plaintiff obligated itself only to the extent of reproducing a sketch it had submitted to the defendant. No attempt to deceive is charged; no fraud was practiced; the transaction was open and notorious and the opportunity to know and observe open alike to both parties. The duty was as much upon the defendant as the plaintiff to know what it was getting and whether what it did get complied with the sample it had chosen from among many. We are not to assume that the defendant did not know that the quotation was incorrect. It had ample opportunity and time to investigate the fact, and the exercise of the most ordinary diligence upon its part would have obviated the error it subsequently treated so seriously. Surely it may not be said that the error upon the face of the proffered sketch is what induced the defendant to enter into the contract. As a matter of fact the inference is strong indeed that the quotation was merely incidental. It was apparently the sketch of the former war President, Abraham Lincoln, that doubtless was designated to arrest public attention, and the transposition of his words with the substitution of two others would not have inured to forestall subscriptions to the bonds, whatever the reflections upon the learning of those who viewed it. Grymes v. Sanders, 93 U. S. 55; United States v. Ames, 99 U. S. 35.
The intent of the lithographer was to present an attractive poster, one which in competition with others would appeal to the public to purchase Liberty bonds. It was an approved method of advertisement, addressed to the people generally, not the execution of a precise and technical instrument whose vitality and usefulness depends upon the exactness in every minute particular. The lithographer was asked to submit a sketch, a design, something in his particular line which people would stop and look over, and having stopped would be impressed with it as a whole, and this he did in entire good faith. The defendant inspected and *356 accepted it, permitted the plaintiff to go forward with the contract and supply the posters, and it is difficult to perceive wherein the transaction can in any possible manner fall outside the ordinary and elementary rules which govern the construction of contracts. The very terms of the proposals exclude the idea of the defendant’s willingness to trust to the judgment of the lithographers.
Another obstacle, quite anomalous, is interposed to forestall recovery under the express contract, a defense which, if meritorious, would necessarily involve the officers of the defendant in violation of express statutory law. A counterclaim is pleaded. Its worthiness is alleged to depend upon the express mandate contained in section 3786 Revised Statutes, which, in terms, provides as follows:
“All printing binding, and blank books for the Senate and House of Representatives and for the executive and judicial departments, shall be done at the Government Printing Office, except in cases otherwise provided by law.”
We think we need only quote section 8 of the act of April 24, 1917, first Liberty loan act, 40 Stat. 35, 37, to dispose of the contention. It is as follows:
“ That in order to pay all necessary expenses, including rent, connected with any operation under this act, a sum not exceeding one-tenth of one per centum of the amount of bonds and one-tenth of one per centum of the amount of certificates of indebtedness herein authorized is hereby appropriated, or as much thereof as may be necessary, out of any money in the Treasury not otherwise appropriated, to be expended as the Secretary of the Treasury may direct.”
The scope, purpose, and intent of the Liberty loan act authorized what was done in this case.
Judgment is awarded plaintiff in the sum of $8,500. It is so ordered.
Graham, Judge; Hay, Judge; DowNey, Judge; and Campbell, Chief Justice, concur.